**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **DARRIN H.,[1]** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:22-CV-2431-MAB** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Darrin H. is before the Court, represented by counsel, seeking review in accordance with 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. For the reasons set forth below, the Court concludes the ALJ made a number of errors in her consideration of the record and the agency's decision must be reversed.

## PROCEDURAL HISTORY

This case has an unfortunately extensive procedural history, and this is the fourth time Plaintiff's case has come before the Court. Plaintiff Darrin H. first applied for disability insurance benefits ("DIB") under Title II of the Social Security Act thirteen years ago, in April 2011. He claimed that he became disabled a year prior, when he was 38 years

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

old, following lumbar spine surgery (Tr. 117–24, 143, 146, 160–70). He alleged, in a nutshell, that despite the surgery, he continued to suffer from chronic and severe lower back pain and radiating pain and weakness in his legs, which made it difficult to do almost any type of physical activity (Tr. 146, 160–70).

His disability claim was denied initially and on reconsideration (Tr. 61, 65–69; Tr. 62, 70–74). Plaintiff requested a hearing before an administrative law judge (Tr. 75–78), which did not take place until over a year later in August 2012. Plaintiff testified at the hearing, as did vocational expert ("VE"), Thomas Guslof (Tr. 35–61). ALJ William Sampson then denied Plaintiff's claim in September 2012 (Tr. 15–34, 35–60, 61–62, 65–73). Plaintiff sought judicial review, and in April 2015, the court reversed the ALJ's decision due to the ALJ's erroneous belief that the broken screw in Plaintiff's back had been repaired and the impact that misunderstanding had on the ALJ's assessment of Plaintiff's credibility and the medical opinions (Tr. 830–44). *Hunt v. Colvin*, No. 14-CV-345-CJP, 2015 WL 1746307, at *5–6 (S.D. Ill. Apr. 15, 2015).

On remand, Plaintiff's claim was consolidated with another interim claim that he had filed (Tr. 851–52). Another hearing was held on May 11, 2016, and Plaintiff once again testified, as did a new VE, Dr. Leonard Fisher (Tr. 725–64). The ALJ also sought the opinion of an impartial medical expert, Dr. Peter Schosheim (Tr. 1486–97). The ALJ denied Plaintiff's claim for a second time in November 2016 (Tr. 1708–36), but in October 2017, his decision was reversed and remanded by the court (Tr. 1746–63, 1764). *Hunt v. Berryhill*, No. 17-CV-00069-JPG-CJP, 2017 WL 4777115, at *8–9 (S.D. Ill. Oct. 23, 2017). This time, the Court found the ALJ erred in weighing the medical opinions because his reasons

for rejecting or discounting them were improper under Seventh Circuit law, illogical and unsound, and/or based on misconstrued or cherry-picked facts.

On remand, the case was reassigned to a new ALJ, Gladys Whitfield (Tr. 1574). Over the course of the next two years, four hearings were held. At the first hearing in October 2018, Plaintiff and VE Constance Brown testified (Tr. 1577–1609). At the second hearing seven months later in May 2019, a consulting physician, Dr. Andrew Brown, testified (Tr. 1631–59). At the third hearing four months later in September 2019, a second VE, Matthew Lampley, testified (Tr. 1660–1707). And at the fourth hearing ten months later in July 2020, a third VE, Carrie Anderson, testified (Tr. 1610–30). The ALJ denied Plaintiff's claim in September 2020, finding that although he suffered from several serious medical conditions, including in particular his back problems, he retained the residual functional capacity to perform sedentary work with some additional restrictions on lifting and other non-exertional limitations (Tr. 1542–54). After Plaintiff sought judicial review of the ALJ's decision, the parties filed a joint motion to remand the case, which the Court granted on July 13, 2021. *See* SDIL Case No. 20-cv-1291-MAB, Docs. 20, 21, 22.

On remand, the Appeals Council issued an order outlining the errors committed in the ALJs' decisions up to that point and what the ALJ needed to do to rectify them (Tr. 3278–80). A hearing was held on April 21, 2022, at which Plaintiff gave very limited testimony about his previous work and VE Kenneth Jones also testified (Tr. 3219–42). The ALJ issued an unfavorable decision on August 15, 2022, imposing a residual functional

capacity nearly identical to the one imposed in her previous decision[2] and concluding that Plaintiff remained able to perform a significant number of jobs in the national economy (Tr. 3183–3218). Plaintiff elected not to file exceptions with the Appeals Council, and the Appeals Council did not assume jurisdiction. *See* 20 CFR § 404.984(d). The ALJ's decision thus became final on October 18, 2022. *See id*. This action was timely filed on October 19, 2022.

## THE EVIDENTIARY RECORD

Plaintiff was born in 1971 and was 38 years old on the alleged onset date of April 15, 2010, which is the date on which he underwent lumbar spine surgery to address chronic back pain. He is insured for DIB through September 30, 2015 (Tr. 143). The following summary of the record focuses on the period of time between Plaintiff's onset date and date last insured.

### A. AGENCY FORMS & EVIDENTIARY HEARINGS

Plaintiff completed a Function Report in May 2011 shortly after he filed his claim for disability, (Tr. 160–70), and another in July 2011 (Tr. 182–92). He indicated that his pain made it hard for him to do just about everything (*see, e.g.,* Tr. 165, Tr. 187). He could stand for one or two hours at a time but would then be in so much pain that he had to lie down for an hour or more to get relief from the pain (Tr. 160, 161, 167, 170, 192). He could sit *in a recliner* for about one or two hours, but then needed to either stand up and stretch

---

[2] The only difference between the RFC in the 2020 decision and the RFC in the 2022 decision is that ALJ Whitfield said in the former decision that Plaintiff could never crawl, while she said in the latter decision that he could occasionally crawl (*compare* Tr. 1548 *with* Tr. 3194).

his legs or lie down to relieve his pain (Tr. 160, 161, 167, 170, 192) (emphasis added). He estimated that he could walk about half a block before he needed to stop and rest, but he could walk farther if he had something to lean on (Tr. 165, 185, 187, 189). After walking, he needed to lie down for relief (Tr. 170, 192).

Plaintiff said he had a hard time lifting anything over ten pounds (Tr. 160, 167). For example, picking up and carrying a laundry basket was difficult (Tr. 162, 169, 184, 191). Squatting was "very painful" (Tr. 167, 189). Bending was "impossible to do very much and extremely painful" (Tr. 167; *see also* 189). Reaching overhead was also very painful (Tr. 167, 169, 189, 191). Kneeling was difficult because it was painful to get down on his knees and then get back up; at times he needed help getting back up (Tr. 167, 189).

Pain affected Plaintiff's sleep. He took Ambien but was still only able to sleep between two and four hours a night because it was impossible to get comfortable and stay asleep for longer (Tr. 161, 183). He had some difficulty putting on pants, socks, and shoes and difficulty washing his lower body (Tr. 161, 183). Twisting to get in and out of the car was painful (Tr. 170, 192). Getting up from a chair or the couch or getting out of bed was very painful and he had to do so carefully and slowly (Tr. 170, 192). At times, his pain made him moody and grouchy (Tr. 165, 187). He said he took medicine for his pain but "it doesn't help" (Tr. 187; *see also* Tr. 167). He also used a TENSs unit every day, which "takes a little of the edge off of the pain" (Tr. 188, *see also* Tr. 166).

On a typical day, Plaintiff got his kids up for school, helped them with their hair and gave them their medicine (Tr. 161). He would start a load of laundry some days, then feed the dog, and take a shower (*Id.*). After that, he had to lie down for a couple hours

(*Id.*). He would then sit in the recliner for a while, then stand up and go get the mail (*Id.*). Getting the mail required him to walk about half a block, and he had to lie down afterwards (Tr. 161, 163, 185). He basically alternated between sitting, standing, and lying down for the rest of the day until he went to bed (Tr. 161, 183).

When it came to meals, Plaintiff usually did not do anything more than make sandwiches for himself for lunch (Tr. 162, 184). His wife cooked for the family (*Id.*). While he gave the dogs food and water every day, his wife did everything else (taking them outside, walking them, cleaning up after them, etc.) (Tr. 161, 183). Plaintiff could start a load of wash and fold clothes while sitting down if someone brought the basket to him (Tr. 162, 169, 184). He no longer mowed the grass because it was too painful to ride the lawnmower; his brother mowed his grass (Tr. 163, 185).

He went to the grocery store with his wife every week but had to lean on the cart as he walked (Tr. 163, 185). If his pain was really bad that day, he would use the motorized cart (Tr. 163, 185). He went to lunch on Sundays at his mom's house (Tr. 186). He primarily spent his time reading, collecting action figures and comic books, and occasionally going to the movies with his family (Tr. 164, 186).

After his claim was denied initially and on reconsideration, Plaintiff requested a hearing before an ALJ, which took place in August 2012 (Tr. 35–61). Plaintiff's testimony at the hearing was largely consistent with the Functions Reports he had previously filled out (*see* Tr. 160–70, 182–92). At the hearing, Plaintiff described his pain as throbbing, pinching, and constant pressure and said it was normally between a six and an eight out of ten (Tr. 41, 43). He took morphine, Neurontin, a muscle relaxer, and an antidepressant,

but did not think the medications worked as well as he thought they should (Tr. 41). He maintained that in order to alleviate his pain, he had to "constantly sit . . . have [his] feet up . . . and lay down throughout the day" (Tr. 41). He estimated that he spent four or five hours of every day (meaning the time that he was not in bed at night) lying on the couch (Tr. 49). He said that "just not moving" made the pain tolerable (Tr. 43).

Plaintiff testified that he could lift a gallon of milk, but he was unsure whether he could lift a case of soda (Tr. 42). He said that he could only stand for about 10 minutes at a time unless he had something to lean on (Tr. 41). If he stood for too long, his pain shot up to a ten (Tr. 41). He said that he could "sit for a while," meaning "a couple of hours" as long as he had a comfortable chair, meaning a recliner, but then he needed to get up and stretch his legs for a bit because sitting too long would cause his pain to shoot up (Tr. 42, 50). After standing or sitting for any length of time, he had to lie down for about an hour to get relief from the pain (Tr. 42–43). He could not sleep through the night due to his pain, which woke him up at least three or four times a night (Tr. 43; *see also* Tr. 49). He no longer cooked or did the dishes (Tr. 47). He provided limited help with the laundry (Tr. 47; *see also* Tr. 160–67, 182–92). He also no longer did outside work; his brother mowed the lawn for him (Tr. 47; *see also* Tr. 160–67, 182–92)

In April 2015, Plaintiff filled out a new Function Report (Tr. 1014–21). He said he spent half the day lying down or reclining to relieve his pain and fatigue, and he could not make it through the day without lying down or reclining (Tr. 1014, 1015). His daily activities and the chores he did around the house remained very limited (*see* Tr. 1015–17). He said before his back surgery, he used to make dinner every night for his family, but

now he just made himself a simple breakfast (cereal or poptarts) and lunch (sandwich) (Tr. 1017). When he went shopping with his wife, she got the groceries while he just walked along beside her, leaning on the cart for support (Tr. 1017, 1018). He had to lie down or recline when they got home (*Id.*). He now avoided bathing and limited himself to showering once a week due to his pain (Tr. 1015). His pain affected his ability to use the toilet because it could be difficult and painful to wipe and stand up when he was finished (Tr. 1016).

After Plaintiff's claim was remanded back to the agency the first time, another hearing was held on May 11, 2016, at which Plaintiff testified (Tr. 725–64). He said he was never free from pain (Tr. 742). He still took pain medications, which kept his pain at a five or a six (Tr. 742–43). During times that he tried to go off the pain medications, his pain shot up (Tr. 746). He still used the TENS unit (Tr. 742–43), and he was also getting injections regularly every six or eight weeks, which he said made his pain "a little more bearable" (Tr. 747). Despite those measures, he still needed to lie down or recline throughout the day to manage his pain (Tr. 743); just sitting down did not provide him with relief (Tr. 744). When asked roughly how much of the day he spent lying down or reclining, he answered "anywhere from half to three-fourths of the day" (Tr. 738). He frequently changed positions throughout the day and got up off the couch or out of the recliner to stand or walk (Tr. 739). He said if he was not able to recline or lie down as needed, his pain was severe (Tr. 738).

When asked about exercise, Plaintiff testified that he did not do much because it was painful (Tr. 747). He checked the mail every day, which required him to walk about

half a block, but it aggravated his pain and he had to lie down after he got back to the house (Tr. 747). As for activities, Plaintiff further testified that he and his family used to frequently go to the movies but it "just wasn't any fun anymore" because of all the planning and strategizing that it required; for example, he had to look and see how long the movie was, he always had to sit close to the aisle so he could stand up and stretch during the movie, etc. (Tr. 735–36). Plaintiff was asked hypothetically if his back problems "were to magically go away," if there was anything about his heart condition that would keep him from working (Tr. 740). He said no; if his back pain disappeared, he would go back to work because he "can't stand being at home all the time" (Tr. 740–41). He was asked how many days of work he thought he would miss in an average month due to having a bad day pain-wise, and he said "at least one day a week for sure, possibly two" (Tr. 743–44).

When Plaintiff's claim was on remand to the Social Security agency the second time, Plaintiff provided very limited testimony at a hearing in October 2018 before ALJ Whitfield (Tr. 1577–1609). He testified, in response to ALJ Whitfield's questions, that his wife drove him to the hearing because driving long distances caused him pain, that they had to stop after about 20 minutes so he could get out and stretch, and that he sometimes used a cane (Tr. 1583, 1584).

## B. MEDICAL RECORDS

Plaintiff underwent lumbar spine surgery on April 15, 2010, to address chronic back pain. The surgery was performed by neurosurgeon Dr. Pradeep Narotam, and consisted of spinal fusion of the L5 and S1 vertebrae, decompressive lumbar laminectomy

at L5 with foraminotomy of the L5 and S1 nerve roots, and L5-S1 discectomy (Tr. 460–61, 513–15).[3]  Following surgery, Plaintiff was prescribed Percocet or Vicodin for pain, along with a muscle relaxer (*see* Tr. 525–530; *see also* Tr. 521–22, 534–35).

At a three-month postoperative appointment with Dr. Narotam in July 2010, Plaintiff reported continuing lower back pain and pain in his right leg (Tr. 543–48). Earlier that month, he reported that the Vicodin "really ha[d]n't been helping a lot," and he "ha[d] been in quite a bit of pain" (Tr. 539). It was noted that Plaintiff's gait was steady, but he got up from the chair "stiff/slow." A right lumbar trigger point was noted on examination. Dr. Narotam diagnosed Plaintiff with myofascial pain syndrome[4]  and said Plaintiff was not fit for duty and could not return to work (Tr. 544, 550, 551). Plaintiff was referred to a "work hardening program" (Tr. 550; *see also* Tr. 394), which he began that month with a physical therapist (*see* Tr. 239). Plaintiff also received trigger point injections from a nurse practitioner in Dr. Narotam's office (Tr. 549).

---

[3] Spinal fusion is surgery to permanently join together two or more vertebrae so there is no movement between them. A laminectomy involves the removal of the lamina, which is the back portion of a vertebrae, to make more room in the spinal canal and relieve pressure on the nerves. A foraminotomy widens the opening in the spine where nerve roots leave the spinal canal (the foramina) in order to take pressure off the nerve, and a diskectomy is the surgical removal of a herniated disk in the spine. MEDLINE PLUS, *Spinal Fusion*,  https://medlineplus.gov/ency/article/002968.htm  (last visited April 25, 2024) (containing hyperlinks to pages explaining laminectomy, foraminotomy, and diskectomy).

[4] Myofascial pain syndrome "is a chronic pain disorder" that arises from inflammation in the muscles and fascia in a specific area of the body, like the lower back. Symptoms include pain, tender muscles, weak muscles, reduced range of motion, and trigger points, which are sensitive points in the muscles and when they are pushed, they can produce localized pain but also referred pain in other areas of the body. CLEVELAND CLINIC, *Myofascial Pain Syndrome*, https://my.clevelandclinic.org/health/diseases/12054-myofascial-pain-syndrome (last visited April 22, 2024).

The initial evaluation at physical therapy showed that Plaintiff had "impaired muscle activation, strength, and stability" and that pain and spasms limited his spinal and hip range of motion (Tr. 239). The functional goals set for Plaintiff were to be able to walk for 30-45 min, stand for over two hours, sit for one to two hours, and to lift 50–60 pounds from the floor up to his waist—all without significant pain (Tr. 239). Plaintiff attended therapy consistently (Tr. 253–79). At each session, he did strengthening, stretching, and stabilizing exercises, and he also received various other treatments, including hot packs, interferential electrical stimulation ("IFC"), pulsed ultrasound, and manual myofascial release (Tr. 239, 253–79). He continually reported pain in his lower back and, at times, in his right leg, which he rated between five and seven (out of ten), (*see, e.g.*, Tr. 267, 269, 271, 276, 278). He consistently reported that his medications were not providing any relief (*see, e.g.*, Tr. 271, 273; *see also* Tr. 554). The treatments he received at therapy provided him with some relief—his back was less stiff and sore—however, the relief did not last long (*see* Tr. 253–79). The therapist noted that Plaintiff's pain and spasms limited his range of motion and his progress in therapy (Tr. 241).

After six weeks of physical therapy, Plaintiff saw his primary care physician ("PCP") Dr. David Davis on September 3, 2010 (Tr. 392). Dr. Davis noted that Plaintiff's "severe low back pain" persisted despite surgery and physical therapy (Tr. 392). On examination, Plaintiff exhibited diffuse tenderness along his spine and in his paraspinal muscles, limited flexion and extension of his lower back, and mild weakness in both lower extremities. Dr. Davis continued Plaintiff's prescriptions for Vicodin and a muscle relaxer, gave him a five-day course of prednisone (a steroid), and added a 25mcg Fentanyl

patch.[5]  In the weeks that followed, Plaintiff continued to report minimal relief from his pain medications (Tr. 388, 390). The dosage of the Fentanyl patch was increased twice, and he also started taking Neurontin 300mg three times a day (Tr. 388, 390).[6]  At physical therapy, his pain remained unchanged, which led to "slow progress with his exercise performance" and "limited" progress toward his therapy goals" (*see, e.g.*, Tr. 287, 313).

On October 20, 2010, Plaintiff had a six-month postoperative appointment with Neurosurgeon Dr. Narotam (Tr. 561–65; *see also* Tr. 558–59 (x-ray report)). Plaintiff complained of constant low back pain and said that he "wishe[d] he'd never gotten the surgery." Dr. Narotam noted that recent x-rays showed the hardware was in position with no instability and incomplete fusion mass; he rated Plaintiff's fusion at grade three.[7] On examination, Plaintiff had low back tenderness, but straight leg raising was normal,[8] he had no motor or sensory deficits, and he had a steady gait with no limp. Dr. Narotam

---

[5] Fentanyl is a strong opioid, and the patches are used to relieve severe and persistent pain in people who need pain medication around the clock for a long time and have become tolerant to oral narcotic pain medications. MEDLINE PLUS, *Fentanyl Transdermal Patch*, https://medlineplus.gov/druginfo/meds/a601202.html (last visited April 12, 2024).

[6] Neurontin (brand name of the generic drug gabapentin) is an anticonvulsant used to control epileptic seizures but has also been found to relieve chronic pain, especially chronic nerve pain, and it may relieve lower back pain. MEDLINE PLUS, *Gabapentin*, https://medlineplus.gov/druginfo/meds/a694007.html#brand-name-1 (last visited April 12, 2024); MAYO CLINIC, *Chronic pain: Medication decisions*, https://www.mayoclinic.org/chronic-pain-medication-decisions/art-20360371?p=1 (last visited April 12, 2024).

[7] It is unclear from the medical records what "grade 3" meant. The Court will not hazard a guess because there are a variety of scales/systems for grading the progress of interbody fusion based on radiographic imaging, and even the most frequently used do not grade fusions in the same manner. *See, e.g.,* Anneli A. A. Duits, et al. *Radiologic Assessment of Interbody Fusion*, JB & JS REVIEWS, Jan. 2024, at p. 6.

[8] Straight leg raising is a commonly used procedure for detecting nerve root irritation in a patient's lower back. *Gaston O. Camino*, et al., *Straight Leg Raise Test*, https://www.ncbi.nlm.nih.gov/books/NBK539717/ (last visited April 22, 2024). This test can be positive in a variety of conditions, though lumbar disc herniation is the most common.  *Id.*

noted that Plaintiff "continue[d] to smoke heavily despite being informed of its deleterious effect on his fusion and on worsening spine pathology." The treatment note from this appointment lists Plaintiff's work status   as, "[r]eturn to work with light duty 15-30 pound lifting restriction," (Tr. 562), however, Dr. Narotam's nurse practitioner filled out a form that same day that stated Plaintiff "may NOT return to work until seen for follow-up evaluation" in six months and that he "continues with therapy & [is] not able to return to work at full duty at this time." (Tr. 560) (emphasis in original).

Plaintiff continued attending physical therapy and following-up with Dr. Davis throughout the remainder of 2010 (Tr. 309–351; 372–85). He consistently complained of lower back pain and limited relief from the pain medications (*see* Tr. 309–55, 372–73, 377, 383). Treatments at physical therapy provided him with some relief, temporarily lowering his pain to a four or five out of ten (*see* Tr. 319, 321, 323, 325, 327, 329, 333). Plaintiff also told Dr. Davis that he got relief from the pain when he laid down in certain positions and rested (Tr. 377; *see also* Tr. 383). Dr. Davis continued noting that Plaintiff exhibited limited range of motion in his lower back, tenderness along his spine and in his paraspinal muscles, and mild weakness in both his bilateral extremities (Tr. 383). Dr. Davis also began noting loss of lumbar lordosis and multiple trigger points (Tr. 377; *see also* Tr. 372). Dr. Davis ordered a new MRI (Tr. 378), which he said showed a herniation above where Plaintiff had surgery (Tr. 375; *see also* Tr. 405 (MRI report)).[9] Dr. Davis also

---

[9]  The MRI report states that at L4-5 there was disc desiccation associated with a stable far left lateral disc herniation lying adjacent to the left exiting L4 nerve (Tr. 405; *see also* Tr. 485 (July 2009 MRI, prior to surgery, showed the L4-5 disc was degenerated with some focal protrusion into the caudal left neural foramen, where there was mild stenosis)).

switched Plaintiff's pain medication to methadone (5mg, four times a day) because the Fentanyl patches were causing him to vomit (Tr. 372–373),[10] prescribed him Ambien because he was having difficulty sleeping due to pain (Tr. 382), and referred him to Dr. Ragai Mitry, an anesthesiologist and pain management doctor, whom Plaintiff had previously seen pre-surgery for pain management treatment (Tr. 373). Plaintiff was also given a TENS unit at physical therapy, which he said provided him with "good relief" and decreased his pain to a four while it was on (Tr. 321, 323; *see also* Tr. 325, 327, 331).

In the weeks that followed, Plaintiff's methadone dosage was increased three times and he was started on a new muscle relaxer for spasms (Tr. 363, 366, 369). On one occasion when his pain acutely worsened, he was given a five-day course of prednisone and started on Cymbalta (Tr. 363).[11] He also saw Dr. Mitry for the first time postoperatively on February 18, 2011, and received epidural steroid injections plus five trigger point injections (Tr. 407–09, 592–93, 599).

In April 2011, Plaintiff had a one-year postoperative appointment with neurosurgeon Dr. Narotam (Tr. 568–73). He reported that he still had low back pain and some posterior thigh pain. Dr. Narotam noted that current x-rays and a recent MRI (which seems to be the one ordered by Dr. Davis and done in December 2010) showed

---

[10] Methadone is a strong opioid used to treat severe, chronic pain. MEDLINE PLUS, *Methadone*, https://medlineplus.gov/druginfo/meds/a682134.html (last visited April 12, 2024).

[11] Cymbalta (generic name duloxetine) is an antidepressant, specifically a serotonin-norepinephrine reuptake inhibitor, that is also used to treat certain types of chronic pain, including lower back pain. MAYO CLINIC, *Chronic pain: Medication decisions*, https://www.mayoclinic.org/chronic-pain-medication-decisions/art-20360371?p=1 (last visited April 12, 2024).

the hardware was in a good position and there was no instability, no nerve root compression, and no stenosis. It did show a far lateral disc herniation at L4-5, but there was no active root compression. Dr. Narotam noted that Plaintiff had a normal, steady gait and upright posture. On examination, paraspinal tenderness was noted, but his straight leg raise was normal, and he had no motor or sensory deficits. Dr. Narotam diagnosed Plaintiff with mechanical lower back pain and post-laminectomy syndrome, also known as "failed back surgery syndrome," which refers to persistent pain experienced after a spinal surgery.[12] Dr. Narotam directed Plaintiff to attend a pain clinic and instructed him on how to use heat as a treatment, the detrimental effects of smoking, and the importance of exercise and good posture. Dr. Narotam encouraged Plaintiff to quit smoking, to start exercising daily, and told him to "walk with head erect, shoulders back. Use good body mechanics when bending, twisting, and lifting. Avoid sitting for more than 30 minutes at a time. Sit in a firm chair with a straight back." There is nothing in the notes about Plaintiff's work status (*see* Tr. 568–73).

In May 2011, Plaintiff saw Dr. Mitry a second time and received epidural steroid injections and eight trigger point injections (Tr. 590–91, 599). That same month, Dr. Davis noted that Plaintiff's general appearance was "uncomfortable, fatigued" and his mood was "depressed." His medications were switched up: Cymbalta and methadone were discontinued and he was started on MS Contin for pain (60mg three times a day, which

---

[12] HOSPITAL FOR SPECIAL SURGERY, *Post-Laminectomy Syndrome*, https://www.hss.edu/conditions_post-laminectomy-syndrome.asp (last visited April 22, 2024).

was later increased to four times a day),[13] in addition to continuing to take Neurontin (*see* Tr. 362–63, 614, 621). He was also started on an antidepressant (Celexa) and lorazepam (as needed) based on his reports that his pain medications were not helping and he was irritable, having mood swings, and crying regularly (Tr. 614–15).[14]

It was around this time that Plaintiff filed his application for disability benefits. On May 25, 2011, non-examining physician and agency consultant, Dr. Michael Nenaber (who is an internist), reviewed Plaintiff's medical records to conduct an initial disability determination (Tr. 578–585). Dr. Nenaber said Plaintiff had a medically determinable impairment that would reasonably be expected to produce his pain (Tr. 583). The intensity, persistence, and functionally limiting effects of Plaintiff pain were "substantiated by the objective medical evidence." (Tr. 583) And Plaintiff was "seen as credible." (Tr. 583). Dr. Nenaber found that Plaintiff had the residual functional capacity

---

[13] MS Contin is a brand name for the generic drug morphine, which is a strong opioid, in long-acting, extended-release form. This medication is used to relieve pain that is severe and persistent enough to require daily, around-the-clock, long-term opioids and when other pain medications did not work well enough or cannot be tolerated. MAYO CLINIC, *Morphine (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/morphine-oral-route/side-effects/drg-20074216?p=1 (last visited April 23, 2024).

[14] It is well-established that many people who suffer from chronic pain, such as low back pain, also have depression and anxiety. Adam KM Woo, *Depression and Anxiety in Pain*, REVIEWS IN PAIN, March 2010, at pp. 8–12 2010, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4590059/; THE UNIV. OF ARIZ. HEALTH SCI., *Study Shows Millions of People Live with Co-Occuring Chronic Pain and Mental Health Symptoms*, https://healthsciences.arizona.edu/news/releases/study-shows-millions-people-live-co-occuring-chronic-pain-and-mental-health-symptoms (last visited April 25, 2014). Antidepressants are beneficial in treating pain, even when depression isn't recognized as a factor, as are anxiety medications. MAYO CLINIC, *Antidepressants: Another weapon against chronic pain*, https://www.mayoclinic.org/pain-medications/art-20045647#:~:text=These%20drugs%20may%20also%20be,may%20help%20relieve%20chronic%20pain. (last visited April 25, 2014); *see also* AABHA A. ANEKAR, ET AL., WHO ANALGESIC LADDER, https://www.ncbi.nlm.nih.gov/books/NBK554435/ (last visited April 25, 2024).

to perform light work, (*see* Tr. 579, 580; *see also* Tr. 69),[15] and Plaintiff's application for disability benefits was therefore denied (Tr. 61, 65–69). Plaintiff asked the agency to reconsider, and in July 2011, a second non-examining physician and agency consultant, Dr. Sumanta Mita, agreed with Dr. Nenaber's assessment (Tr. 636–38), and Plaintiff's claim was once again denied (Tr. 62, 70–74).

Plaintiff requested a hearing before an administrative law judge (Tr. 75–78), which did not take place until over a year later in August 2012. In the meantime, Plaintiff continued to see his doctors. He reported to Dr. Mitry that the epidural steroid injections and trigger point injections he received in May 2011 did not provide him any relief and the injections were discontinued (Tr. 599). Dr. Davis noted on multiple occasions that Plaintiff appeared uncomfortable and fatigued and exhibited diffusely tender paraspinal muscles, loss of lumbar lordosis, multiple trigger points, and generalized weakness in both lower extremities (Tr. 616–31, 645, 652–59). Dr. Davis continued to prescribe and adjust Plaintiff's medications, including MS Contin, Neurontin, a muscle relaxer, lorazepam, and an antidepressant.

On February 14, 2012, Plaintiff underwent an independent medical evaluation with David Fletcher, M.D., who is board-certified in Occupational and Preventative Medicine (Tr. 670–85). Dr. Fletcher reviewed Plaintiff's postoperative medical records and also examined Plaintiff. Plaintiff reported that his pain was a "7–8," which meant "severe pain" and "[u]nable to perform daily tasks and unable to perform job" (Tr. 670,

---

[15] *See* Social Security Ruling 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983) (defining sedentary, light, and medium levels of exertion).

679; *see also* Tr. 671). Dr. Fletcher noted that Plaintiff walked with a limp with decreased weight bearing on his right leg (Tr. 680). On examination, Plaintiff had reduced range of motion in his lumbar spine, which Dr. Fletcher believed was an accurate representation of his abilities (Tr. 680). Plaintiff had tenderness in the low back area but no muscle spasms (Tr. 680). He had normal reflexes in his ankles and knees, which indicated there was no nerve root entrapment (Tr. 681). Other objective tests, however, were positive for nerve root involvement or compression at the right L5 nerve (*Id.*). Tests aimed at identifying whether a patient was magnifying his symptoms or malingering were negative (Tr. 681–82), and Dr. Fletcher noted there was no evidence of overt symptom magnification (Tr. 670). He further stated that Plaintiff's subjective complaints of pain were consistent with the objective findings, and Plaintiff's functional and daily activity levels were likewise consistent with the objective findings, the medical records, and the severity of his subjective complaints (Tr. 670, 671).

Dr. Fletcher's primary diagnosis was failed low back syndrome with chronic right L5 radiculopathy, and his secondary diagnosis was depression, which added to Plaintiff' decreased function and deconditioning (Tr. 670-671, 684–85). Dr. Fletcher opined that Plaintiff had incurred "moderate permanent loss" to his functionality, and permanent job restrictions were necessary, including: no lifting more than 10 pounds, no repetitive waist bending, and he must have the ability to alternate from the sit to stand position at will (Tr. 671, 673). Dr. Fletcher recommended that Plaintiff undergo a Functional Capacity Evaluation "to best define his work capacity" (Tr. 671). He further opined that Plaintiff was only capable of working "20–30 hours per week in the beginning" because he was

"deconditioned and need[ed] to build up to a 40-hour work week" (Tr. 672). Dr. Fletcher believed that Plaintiff had been undertreated and recommended that he quit smoking, switch from Neurontin to Cymbalta, undergo additional diagnostic testing (electrical studies and a myelogram or CT scan), and potentially consider the insertion of a spinal stimulator for pain control (Tr. 671). Dr. Fletcher stated that Plaintiff's prognosis was "[v]ery guarded" and "if additional testing shows no surgically remedial correctable problem [then] he is MMI," which means maximum medical improvement (Tr. 673).

Following Dr. Fletcher's examination, Plaintiff underwent a functional capacity exam (also referred to in the records as a "Physical Work Performance Evaluation") in April 2012, which was conducted by physical therapist Chet Clodfelter (Tr. 686–95). The exam lasted nearly three and a half hours (Tr. 686). Mr. Clodfelter noted that Plaintiff reported back pain at the start of and throughout the exam, bilateral thigh pain as the exam progressed, and a slight increase in overall pain level at the end of the exam (Tr. 687, 689; *see also* Tr. 691–93). Plaintiff also demonstrated pain behaviors throughout the exam, like rubbing his thighs, putting hands on his hips, leaning to try to change the pressure of the pain, decreased weight bearing on one leg, and shifting his weight when standing and stooping (Tr. 687, 692, 693). Mr. Clodfelter found that Plaintiff's dynamic strength and position tolerance were major areas of dysfunction and that he was generally deconditioned, (Tr. 689), but concluded that Plaintiff was capable of sustaining full-time work at the light exertional level with the following postural limitations: he could never "work bent over — standing/stooping," and could only occasionally stand, kneel, climb stairs, and repetitively squat (Tr. 686–95). Plaintiff later testified that during

this exam, he "lift[ed] all kinds of heavy stuff," and "it proved that I could pick it up, but I mean . . . the pain was ridiculous while I was doing it." (Tr. 42). He also said that he had to stop twice on his way home from the exam because his pain was so bad, and he spent the next couple days lying down and only getting up when he absolutely had to (Tr. 737).

The following month, Plaintiff saw neurosurgeon Dr. Narotam for a two-year postoperative follow-up on May 9, 2012 (Tr. 647–51, 661–69). The notes do not say much about Plaintiff's subjective complaints other than he reported low back pain but no leg pain or claudication. Dr. Narotam noted that recent x-rays showed one of the screws in Plaintiff's back was broken and slight retrolisthesis of the L5 vertebrae on S1.[16] And he graded Plaintiff's fusion as "2 poor." On exam, Plaintiff had paraspinal tenderness and straight leg raising was limited to 70 degrees, but he had no focal neurological deficits. Dr. Narotam observed that Plaintiff had a normal gait both before and after the exam and sat cross-legged in the waiting room. Dr. Narotam wrote that Plaintiff "[d]isplays symptom exaggeration behavior." He again recommended that Plaintiff apply heat for 30 minutes on and 30 minutes off and walk as tolerated for exercise. He also noted that Plaintiff's work status was "Return to work with light duty 15–30 pound lifting restriction."

---

[16] Retrolisthesisis is when one vertebrae slips backward onto the vertebra immediately below. Michael Shen, et al., *Retrolistesis and Lumbar Disc Herniation: A Pre-operative Assessment of Patient Function*, THE SPINE JOURNAL, July 2007, at pp. 406-413, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2278018/ (last visited April 25, 2024).

ALJ Sampson denied Plaintiff's disability claim in September 2012, and Plaintiff sought judicial review (Tr. 15–34, 35–60, 61–62, 65–73). While awaiting the court's decision, Plaintiff's medical care and attempts to alleviate his pain continued. He saw his PCP Dr. Davis throughout 2013 for medications (Tr. 1379–84, 1406). Despite taking Neurontin, a muscle relaxer, and morphine, he continued to complain of pain, which was significantly worse at times (*Id.*). He went to the emergency room on one occasion when his back pain became "exceptionally worse" (Tr. 1173–74). The ER physician gave him an injection of Dilaudid (hydromorphone) and discharged him with enough hydromorphone tablets to last him through the weekend (Tr. 1173–74).[17] During another period of worsening pain, he received injections of Kenalog and Toradol at Dr. Davis's office and he was started on a nine-day course of steroids (Tr. 1379–80).[18] He also started taking Lexapro for his depression and anxiety (Tr. 1380). And he was sent back to physical therapy (Tr. 1381–82; *see also* Tr. 1086–94).

At his initial physical therapy evaluation on November 5, 2013, Plaintiff reported that his pain was in his lower back and radiated down his right leg, and he also regularly

---

[17] Dilaudid is the brand-name version of the generic drug hydromorphone, which is said to be more potent than morphine. Padma Gulur, et al., *Morphine versus Hydromorphone: Does Choice of Opioid Influence Outcomes?*, PAIN RESEARCH AND TREATMENT, Nov. 2015, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4644543/#B15 (hydromorphone is five to ten times more potent than morphine).

[18] Kenalog is a brand-name version of the generic drug triamcinolone; it is a corticosteroid and relieves inflammation. MAYO CLINIC, *Triamcinolone (Injection Route)*, https://www.mayoclinic.org/drugs-supplements/triamcinolone-injection-route/description/drg-20074674 (last visited April 23, 2024). Toradol is a brand-name version of the generic drug ketorolac; it is a nonsteroidal anti-inflammatory drug used for short-term relief of moderately severe acute pain. MEDLINE PLUS, *Ketorolac Injection*, https://medlineplus.gov/druginfo/meds/a614011.html (last visited April 23, 2024).

experienced numbness and paresthesia in his right leg (Tr. 1086–87). He said the pain was constant—a five at best and a ten at worst. Plaintiff said that standing, walking, bending, and lifting aggravated his pain. He could tolerate sitting for two hours but could only walk for 15-20 minutes without significant pain. He also reported that he had difficulty washing his lower body, carrying a basket of clothes, and loading/unloading the wash machine. He also had to wear slip-on shoes. He had difficulty falling and staying asleep due to his pain, and only got an average of three hours of sleep per night. On examination, Plaintiff demonstrated some gait abnormality, moderate tenderness and very reduced active range of motion in his lower back, weakness in all twelve muscles assessed, impaired flexibility in all areas tested, and a positive straight leg raise test (Tr. 1087–89). The goals set for Plaintiff included regaining some strength in all areas and some range of motion in his lumbar spine, and being able to stand or walk for one hour.

Plaintiff attended thirteen physical therapy sessions from November 5, 2013, through December 30, 2013 (Tr. 1086-1118). He was initially scheduled for twenty sessions but was unable to attend more due to insufficient funds for transportation and the expiration of his insurance authorization (Tr. 1218). Throughout the seven weeks of physical therapy that he did attend, Plaintiff's pain varied from a high of 8–9 (out of ten) and never got lower than a six (*see* Tr. 1095–1118). He commonly exhibited guarded and slow movements, and his effort was never questioned (*see id.*).

Throughout 2014, Dr. Davis continued prescribing morphine, Neurontin, muscle relaxers, and antidepressants to Plaintiff (Tr. 1183–1201, 1219–21, 1265–78). In early March 2014, Plaintiff complained of chest pain to Dr. Davis (Tr. 1389–90). He was sent to

the emergency room and admitted to the hospital, where he underwent catheterization, angioplasty, and stent placement (Tr. 1127–32; 1208–15). Plaintiff then had regular follow-up appointments with a cardiologist throughout 2014 and 2015 (Tr. 1239, 1316, 1322, 1328). Plaintiff also followed-up with Dr. Davis (Tr. 1189–90, 1195–96). He described his back pain as a constant dull ache relieved with rest along with a sharp, shooting pain after standing for more than 15 minutes (Tr. 1189–90, 1398–99). His muscle relaxers were switched, and he was also referred back to pain management physician Dr. Mitry.

Plaintiff saw Dr. Mitry in May 2014, however, he had to wait six-months to get injections due to medication he was on for his heart (Tr. 1177, 1183). Dr. Mitry also requested an updated MRI, which showed worsening degenerative changes, including mild circumferential disc bulging at three levels (L2-L3, L3-L4, and L4-L5), facet hypertrophy at all levels, mild stenosis at L2-L3 and L3-L4, and mild to moderate foraminal narrowing at four levels (Tr. 1205-06).

In August 2014, Plaintiff underwent an examination with state agency medical examiner, Dr. Vittal Chapa (Tr. 1226–28). The exam lasted 26 minutes. Plaintiff told Dr. Chappa that he could not stand for long periods of time, he had difficulty bending, physical activity aggravated his back pain, and he lied down most of the day. On examination, Plaintiff's gait was normal, he had sensation in both legs and no motor weakness or muscle atrophy, but he did have diminished reflexes. He could only bend over 30 degrees and the straight leg raise was positive bilaterally at 70 degrees.

On September 3, 2014, Dr. Davis completed an "abbreviated residual functional capacity report," which asked him to assume that Plaintiff would engage in sedentary

work (Tr. 1293–95, 1419-21). Dr. Davis opined that Plaintiff would miss work about twice a month due to his pain and treatment for his pain (Tr. 1295). Dr. Davis also opined that Plaintiff did *not* need to take extra breaks at work due to pain (Tr. 1294). However, in subsequent sworn testimony, Dr. Davis retracted the latter opinion (Tr. 1439–40). Specifically, he said the only reason he could think of as to why he check-marked that Plaintiff did not need extra breaks was because he did not fully understand the question being asked (*Id.*) He further testified that he *did* believe that from April 2010 forward, Plaintiff needed to take additional breaks to lie down during the day in order to manage his pain (*Id.*).

In November 2014, Plaintiff resumed getting epidural steroid injections from Dr. Mitry (Tr. 1258–59, 1282–83, 1303–04), which Plaintiff indicated "did seem to improve his back pain some" (Tr. 1266–67). Plaintiff got additional injections in January 2015 (Tr. 1256–57, 1279–80, 1306–07, 1445–46), but two months later reported less than 50% relief and less benefit than prior injections (Tr. 1345, 1447). Dr. Mitry noted that Plaintiff's pain was in his lower back and went into both buttocks and down both legs, with the left being worse than the right (Tr. 1447–48). Plaintiff reported that he had a hard time walking, bending forward, and doing pretty much most activities. He had not been doing any back exercises due to the severity of the pain. Dr. Mitry noted that Plaintiff walked with a wide-based gait and slight limp (Tr. 1447), which PCP Dr. Davis also noted a week and a half later (Tr. 1345–46 ("walking with noticeable limp, able to bear weight but painful")). Dr. Mitry noted that heel walking and toe walking could be done but it exacerbated Plaintiff's pain (Tr. 1447). Plaintiff could not bend forward more than 30 degrees. Bending

backward and to the side was "limited and painful." Straight leg raising was limited to 20 degrees. Deep tendon reflexes could not be elicited at all in the lower extremities. And there were multiple areas of muscle spasms, tenderness, and trigger points in the lower back. Dr. Mitry's diagnosis was post lumbar laminectomy, lumbar radiculopathy, and myofascial pain. He talked through the different options available to Plaintiff and emphasized the importance of doing some kind of physical activity, even if it hurt.

Plaintiff opted to try lumbar epidural lysis of adhesions,[19] which Dr. Mitry performed on April 22, 2015, at the L4– L5 level, along with five trigger point injections (Tr. 1309-10, 1449–50). He noted that if Plaintiff did not respond well to this procedure, the next logical step would be to consider a spinal cord stimulator (Tr. 1310). Following this procedure, PCP Dr. Davis filled out a second "abbreviated Functional Capacity Report," opining that Plaintiff would have some environmental restrictions, but his opinions otherwise remained the same (Tr. 1422–24).

At a follow-up with Dr. Mitry in June 2015, Plaintiff reported that the lysis of adhesions did not help as much as the prior epidural steroid injections (Tr. 1451). Plaintiff

---

[19] Epidural adhesions are scar tissue formed in the epidural space after surgery. These adhesions can cause back and leg pain by compressing nerve roots, decreasing range of motion in the back, and inducing pain with movement. Adhesions may contribute to or cause failed back surgery syndrome and also compromise the efficacy of epidural steroid injections. Lysis of adhesions is a minimally invasive procedure used when conservative treatment has failed. It involves inserting a catheter into the epidural space, which physically breaks up scar tissue and as well as medications and fluids (such as steroids, local anesthetic, and enzyme and hypertonic saline) to relieve pain, dissolve scar tissue, and reduce inflammation. SARAH BUSH LINCOLN, *Lysis of Epidural Adhesions*, https://www.sarahbush.org/services/interventional-pain/lysis-epidural-adhesions/ (last visited April 23, 2024); Frank Lee, et al., *Epidural Lysis of Adhesions*, KOREAN J. PAIN, Jan. at pp. 3–15, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3903797/; Zafeer Baber, et al., *Failed Back Surgery Syndrome: Current Perspectives*, J. PAIN RES, Nov. 2016, at pp. 979–987, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5106227/.

said that in hindsight, the epidural steroid injections "were actually quite decent as far as pain relief goes." Dr. Mitry examined Plaintiff and his findings were largely the same as the previous visit in March 2015 (Tr. 1451; *see also* Tr. 1456 (same in Sept. 2015), Tr. 1457 (same in December 2015)). The plan was to resume epidural steroid injections and trigger point injections the following month (Tr. 1451). Before that happened, however, Plaintiff saw Dr. Davis for an acute flare of pain (Tr. 1353–54). He was given shots of Kenalog and Toradol in the office and started on a nine-day course of prednisone (Doc. 1452). Three weeks later, he received epidural steroid injections plus trigger point injections (Tr. 1312-13, 1365–66, 1452–53).

In August 2015, Dr. Davis filled out a third "abbreviated Functional Capacity Report" (Tr. 1426–29). Dr. Davis opined that as of April 15, 2010, which is Plaintiff's disability onset date, he would require breaks from work activity greater than one hour a day, would miss work more than three times a month due to his pain or pain treatment, and needed various environmental restrictions. Dr. Davis subsequently testified that, to the extent this report differed from his previous report where he said Plaintiff would miss work up to two times per month, it simply reflected there was some degree of variability as to how often he would miss work (Tr. 1439–40). But the overall picture was that, following his back surgery in April 2010, Dr. Davis found it credible that Plaintiff would have bad days on which he would not be able to make it in to work (*Id.*). Plaintiff continued taking his pain medications and receiving epidural steroid injections and trigger point injections throughout 2015 and 2016 (Tr. 1359–60, 1454–59, 1500–05, 1511–12, 1524–25).

In July 2016, ALJ Sampson sought the opinion of an impartial medical expert, Dr. Peter Schosheim (Tr. 1486–97). Dr. Schosheim did not examine Plaintiff but rather completed interrogatories and a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form (Tr. 1533–1541). He opined that Plaintiff could sit for two hours at a time and six hours total during an eight-hour workday. He could stand for 20 minutes at a time and one hour total during an eight-hour workday. And he could walk for one minute at time for a total of one hour during an eight-hour workday. Dr. Schosheim opined that Plaintiff could occasionally lift and carry up to 10 pounds, but never anything heavier. He could frequently reach in all directions, including overhead, and push and pull with both arms. He could occasionally operate bilateral foot controls, balance, stoop, kneel, crouch, crawl, and climb ramps and stairs but could never climb ladders and scaffolds.

When Plaintiff's claim was on remand to the Social Security agency the second time, consulting physician, Dr. Andrew Brown, testified at a hearing in May 2019 (Tr. 1631–59). Dr. Brown had reviewed Plaintiff's medical records but had not examined him. He opined, amongst other things, that Plaintiff could sit for six hours in an 8-hour workday; stand and walk for two hours in an 8-hour workday. Dr. Brown further opined that Plaintiff could lift up to 10 pounds occasionally, but later clarified that Plaintiff should never lift anything from the ground/floor up to desk level. Plaintiff could lift from the desk level and carry up to 10 pounds occasionally and five pounds for 50% of the day. Dr. Brown gave conflicting testimony about Plaintiff's ability to reach overhead and in all directions, first saying Plaintiff could do so frequently and then saying he could do so

only occasionally. Dr. Brown opined Plaintiff could occasionally use foot controls, climb stairs and ramps, balance, kneel, and crouch. But crawling should be avoided, as well as ladders and scaffolds.

### THE ALJ'S DECISION

To qualify for DIB, a claimant must prove that they became disabled by their date last insured. 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. § 404.131; *Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012 ("the claimant must establish that he was disabled before the expiration of his insured status . . . to be eligible for disability insurance benefits."); *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). Under the Social Security Act, a person is disabled if they have an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also* 20 C.F.R. § 404.1505.

Here, ALJ Whitfield concluded that Plaintiff was not disabled and could perform sedentary work as defined in 20 C.F.R. § 404.1567(a) with some additional restrictions. In reaching this determination, the ALJ followed the familiar five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of April 15, 2010, through his date last insured of September 30, 2015 (Tr. 3189). At step two, the ALJ found that through the date last insured, Plaintiff had the severe impairments of lumbar degenerative disc disease and fracture, status-post laminectomies and spinal cord stimulator, and a history of cardiac pathology (as well as

non-severe impairments of trigger finger and obesity) (Tr. 3189–92). At step three, the

ALJ determined that none of Plaintiff's severe impairments, alone or in combination, met

or medically equaled a listed impairment (Tr. 3192–94). The ALJ then found that, despite

Plaintiff's medical conditions, he retained the residual functional capacity through the

date last insured, to perform sedentary work with some additional restrictions on lifting

and other non-exertional, postural, and environmental limitations. Specifically, the ALJ

determined that Plaintiff could:

- Sit for six hours in an eight-hour workday
- Stand and/or walk for two hours in an eight-hour workday;
- Lift/carry 10 pounds occasionally and less than 10 pounds frequently, but could *not* lift from the ground/floor to table top level and could *not* carry more than five pounds for 50 percent of the workday;
- Frequently push and/or pull with bilateral upper extremities;
- Occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs;
- Never crawl or climb ladders, ropes, or scaffolds;
- Frequently reach forward and sideways, and occasionally reach overhead with bilateral upper extremities;
- Continuously handle, finger, and feel;
- Occasionally operate bilateral foot controls but never perform work where driving is required to perform functions of the job;
- Occasionally be exposed to extreme heat, extreme cold, wetness, humidity, and vibrations;
- Never be exposed to fumes, odors, dusts, gases, poorly ventilated areas, and hazards such as unprotected heights and moving machinery.

(Tr. 3194). *See* 20 C.F.R. § 404.1567(a) (defining sedentary work).

At step four, the ALJ concluded that Plaintiff could no longer perform his previous

jobs (Tr. 3201). At step five, the ALJ determined, based on the testimony of three

vocational experts, there were unskilled, sedentary jobs that existed in significant

numbers in the national economy that the claimant could have performed through the

date last insured of September 30, 2015, such as a food and beverage order clerk, charge account clerk, assembler, sorter, address clerk, and table worker (Tr. 3201). Therefore, Plaintiff was not disabled.

### Issues Raised by Plaintiff

1. Whether the ALJ erred when she determined Plaintiff's RFC by omitting discussion of important evidence?

2. Whether the ALJ erred when she evaluated the medical opinion evidence?

3. Whether the ALJ erred when she found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the medical evidence and other evidence in the record?

(Doc. 21-1; Doc. 30).

### Discussion

The scope of judicial review is limited to determining whether the ALJ applied the correct legal standard in reaching their decision, whether the ALJ's decision is supported by substantial evidence, and whether the ALJ "buil[t] an accurate and logical bridge from the evidence to [their] conclusion" that the claimant is not disabled. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal citations omitted). In other words, "the ALJ must explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). The court reviews the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). The ALJ's decision will be reversed "only if the record

compels a contrary result." *Deborah M.*, 994 F.3d at 788 (internal quotation marks and citation omitted).

Plaintiff argues that the ALJ erred in formulating his RFC because the ALJ ignored critical evidence, improperly evaluated opinion evidence from physicians, and improperly discounted Plaintiff's own statements regarding the intensity, persistence, and limiting effects of his pain (Doc. 21-1). After carefully reviewing each of Plaintiff's arguments and the Commissioner's response, the Court agrees that the ALJ erred in formulating Plaintiff's RFC. In the interest of judicial economy, the Court will address only the arguments that it finds persuasive and which it considers to be the most significant errors.

A claimant's RFC is "the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008); 20 C.F.R. § 404.1545(a)(1), (3). The ALJ must determine the claimant's RFC based on "all the relevant evidence in [the] case record," which includes the objective medical evidence as well as statements from medical sources, the claimant's own statements about their symptoms and limitations, and statements from non-medical sources, like family, friends, neighbors, and agency personnel. 20 C.F.R. § 404.1545(a)(1), (3); *see also Craft*, 539 F.3d at 676. "[A]lthough an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it. The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). *See also* Social Security Ruling 96-8p ("SSR 96-8p"),

1996 WL 374184, at *7 (July 2, 1996).

## A.  FAILURE TO PROPERLY ANALYZE MEDICAL OPINIONS

Plaintiff's strongest contention is that the ALJ inadequately analyzed a number of crucial medical opinions. "An ALJ must consider all medical opinions in the record." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing 20 C.F.R. § 404.1527(b), (c)). If the RFC determination conflicts with an opinion from a medical source, "the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7.

### 1.  Opinion re: Inability to Work 40 Hours a Week

The first opinion that the ALJ failed to properly analyze is the opinion of independent medical examiner, Dr. David Fletcher, that Plaintiff was not capable of working full-time as of February 2012 (Tr. 672). This opinion was important because "[a] claimant unable to work full-time is considered disabled." *Day v. Astrue*, 334 Fed. Appx. 1, 7 (7th Cir. 2009). *Accord Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) ("[A]person who cannot work eight hours a day, five days a week, or the equivalent, is disabled . . . .") (citing SSR 96-8p, 1996 WL 374184, at *1). *See also Elder v. Astrue,* 529 F.3d 408, 414 (7th Cir. 2008) (citing *Bladow v. Apfel,* 205 F.3d 356, 359 (8th Cir. 2000) (explaining that, under Social Security Ruling 96–8p, ability to work only part-time mandates disability finding)).

The ALJ was clearly aware of the opinion because the ALJ noted that Dr. Fletcher "recommended the claimant to return to work as it is one of the most important parts of therapy, but due to deconditioning, he should start at 20 to 30 hours per week and build up to a 40 hour work week." (Tr. 3199). And the ALJ said she gave "great weight" to Dr. Fletcher's opinions (*Id.*). However, the ALJ went on to conclude that Plaintiff was not

disabled between his onset date and his date last insured, which makes clear that she implicitly rejected Dr. Fletcher's opinion that Plaintiff was unable to work full-time.

This rejection came without any explanation. In other words, the ALJ omitted any analysis regarding aspects of a medical opinion the ALJ otherwise found persuasive but which conflicted with the assigned RFC. "An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citation omitted). The ALJ's failure to offer any explanation as to why she rejected Dr. Fletcher's opinion that Plaintiff was not capable of working 40 hours per week leaves the decision without an accurate and logical bridge from the evidence to the conclusion that Plaintiff could work full time. *See Roddy*, 705 F.3d at 636. *See also Spicher v. Berryhill*, 898 F.3d 754, 758 (7th Cir. 2018) (where ALJ gave great weight to doctor's opinion but RFC imposed contradicted and implicitly rejected that opinion, ALJ "was required to provide enough analysis to allow a re-viewing court to determine why she rejected it.").

### 2. Opinion re: Additional Breaks

Plaintiff's primary care physician, Dr. Davis opined that, due to pain and fatigue, Plaintiff would require extra breaks totaling more than one-hour in an eight-hour workday (Tr. 1427; *see also* Tr. 1294, 1439–40). The ALJ erroneously stated that Dr. Davis "did not indicate the claimant would need extra breaks or time off task" (Tr. 3198), and therefore altogether failed to evaluate this opinion.

Relatedly, there are numerous statements in the record from Plaintiff that suggest he would require extra breaks at work. In particular, he said in his Function Reports that

anytime he stood or sat for an extended period of time, he would have to lie down or recline for an hour or more afterwards to get relief from his pain (Tr. 160–70; 182–92; 1014–20). He said he could not make it through the day without lying down, and he estimated that he spent half the day either lying down or reclining (*Id.*). Plaintiff twice provided sworn testimony to the same effect (Tr. 41, 42–43, 49, 738, 743–44, 747). The ALJ's decision failed to acknowledge Plaintiff's statements about needing to lie down or recline throughout the day to manage his pain (*see* Tr. 3186–3203). The ALJ cannot simply ignore a claimant's testimony and was required to explain why Plaintiff's testimony was not accepted. *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) (an ALJ is required "to articulate specific reasons for discounting a claimant's testimony as being less than credible" and is precluded from "merely ignoring" the testimony . . . .").

Dr. Davis's opinion that Plaintiff would require extra breaks and Plaintiff's statements that he had to repeatedly lie down during the day to relieve his pain are important because the vocational experts who testified at the various hearings said extra breaks that led a claimant to be off task more than ten percent of the day would exceed employer tolerances and make the claimant unemployable (Tr 759-62; Tr. 1592-93, 1598; Tr. 1680–81, 1695–96; Tr. 1624-1627; Tr. 3231). Some of the vocational experts also testified that there would be no tolerance for lying down and limited tolerance for needing to leave work early to lie down (Tr. 1593; Tr. 1697–98; Tr. 3236). Because the need for extra breaks to lie down would eliminate employment for Plaintiff, the ALJ's failure to adequately analyze Dr. Davis's opinions is reversable error.

### 3. Opinion re: Absenteeism

Dr. Davis also opined that Plaintiff would miss work about twice a month due to his impairments or treatment (and later said that Plaintiff would miss work more than three times a month) (Tr. 1421, 1428). This opinion is important because the vocational experts who testified at the various hearings said that if a claimant misses work more than once a month (which includes a half-day, coming in late, or leaving early), it would exceed employer tolerances and make the claimant unemployable (Tr. 1599, 1607; Tr. 1624; Tr. 1695, 1697; Tr. 3231). The ALJ acknowledged Dr. Davis's opinion regarding Plaintiff's absenteeism but rejected it, stating:

> [T]he records, including Dr. Davis' findings[,] do not support the claimant . . . would be absent from work more than two days per month. Dr. Davis' records all show findings that the claimant's back was diffusely tender with loss of lumbar lordosis, multiple trigger points, and healed surgical scar low midline back until 2014 when only diffusely tender appears with occasional mention of reduced range of motion. Furthermore, the evidence also shows the claimant has been resistant to the recommendations of Dr. Davis including exercising and smoking cessation.

(Tr. 3198–99).

The ALJ's explanation for rejecting Dr. Davis's opinion regarding Plaintiff's absenteeism is not sufficient because the Court simply cannot discern any of the ALJ's reasons for setting aside Dr. Davis's opinion. While the ALJ cited medical signs and clinical findings from Dr. Davis's records, she did not explain *how* or *why* those signs and findings undermined the doctor's opinion regarding Plaintiff's absenteeism, nor is not apparent to the Court. Additionally, the ALJ did not accurately recount the contents of Dr. Davis's records and the overall picture that they portrayed. His records in 2014 and

beyond showed far more than "diffusely tender with occasional mention of reduced range of motion," like the ALJ said. The records actually mentioned decreased range of motion regularly and continued to indicate loss of lumbar lordosis throughout 2014 and 2015 (Tr. 1183–97, 1219, 1266–75, 1345, 1349, 1353). In 2015, Dr. Davis noted that not only were Plaintiff's paraspinal muscles tender, but so was his spine itself, and he was walking with a noticeable limp (Tr. 1345, 1359). The records also showed that Plaintiff complained of sharp, shooting pain after standing for 15 minutes (Tr. 1189–90); that he was referred to pain management specialist Dr. Mitry, whom he began to see regularly for procedures (*Id.*); that Dr. Davis continued to prescribe very strong opioid pain medication and neuropathic pain medication to Plaintiff (Tr. 1183, 1189, 1195, 1197, 1219–20, 1267, 1272, 1275, 1345, 1349, 1353); and that his pain did not improve at any point in 2014 or 2015, and in fact, it was acutely worse on at least one occasion (Tr. 1266, 1272, 1353).

As for the statement that "the claimant has been resistant to the recommendations of Dr. Davis including exercising and smoking cessation," the Court is once again unsure what the ALJ is getting at here. The ALJ did not explain how Plaintiff's avoidance of exercise or failure to quit smoking has any bearing on Dr. Davis's opinion that Plaintiff would miss work too much to sustain employment. Again here, the connection is not apparent to the Court. Normally, if a claimant fails to follow prescribed treatments that might improve their pain, that gives rise to an inference that the intensity and persistence of their pain is not as bad as they claim. SSR 16-3p, 2017 WL 5180304, at *9. However, that inference cannot be drawn without considering the possible reasons that the claimant is not complying with treatment. *Id.* Here, the record is rife with statements and instances

where physical activity was unbearably painful for Plaintiff, which the ALJ neglected to mention. When it comes to smoking, the Seventh Circuit has long recognized that people "continue to smoke, not because they do not suffer gravely from [pain], but because other factors such as the addictive nature of the product impacts their ability to stop." *Martinez v. Kijakazi*, 71 F.4th 1076, 1082 (7th Cir. 2023) (quoting *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000)). Furthermore, there is no evidence that smoking caused Plaintiff's pain or that stopping would significantly improve his health and restore his ability to work. *Childress v. Colvin*, 845 F.3d 789, 793 (7th Cir. 2017); *Shramek*, 226 F.3d at 813. The Court therefore does not see how Plaintiff's failure to exercise or to quit smoking could fairly be considered as a reason to discount Dr. Davis's opinion regarding Plaintiff's absenteeism.

In sum, the ALJ's explanation as to why she rejected Dr. Davis's opinion regarding Plaintiff's absenteeism was factually inaccurate and did not contain sufficient analysis to allow the Court to determine why she rejected it, let alone assess the validity of the ALJ's reasoning. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (noting ALJ's "must provide a 'logical bridge' between the evidence and the conclusions so that we can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review"). Indeed, the records seem to fully support Dr. Davis's opinion that Plaintiff would miss work multiple times per month given that Plaintiff had days where his pain was particularly bad and that he had regular and frequent medical appointments for his various impairments.

B. **FAILURE TO PROPERLY EVALUATE PLAINTIFF'S STATEMENTS RE: HIS PAIN**

The Court also finds that the ALJ erred in evaluating Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms. While the ALJ had no doubt that Plaintiff's impairments caused a variety of symptoms, including pain, the ALJ thought that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" (Tr. 3195, 3196). In other words, the ALJ did not believe Plaintiff's pain was as bad as he said it was.

Once the ALJ has determined there is an underlying physical impairment that could reasonably be expected to produce an individual's symptoms, the ALJ must then evaluate the intensity and persistence of those symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. Social Security Ruling 16-3p ("SSR 16-3p"), 2017 WL 5180304, at *4, 5 (Oct. 25, 2017); 20 C.F.R. 404.1529(c)(1). In evaluating the intensity, persistence, and limiting effects of an individual's symptoms, the ALJ must examine *the entire case record*, beginning with the objective medical evidence. SSR16-3p, 2017 WL 5180304, at *4, 5 (emphasis added); 20 C.F.R. §§ 404.1529(c)(3). If the claimant's subjective statements about the severity of their symptoms is not fully substantiated by the objective medical evidence, then the ALJ must carefully consider whether the claimant's statements are consistent with the other medical and non-medical evidence in the record. SSR 16-3p, 2017 WL 5180304, at *6–7. Per the agency regulations, the ALJ must also consider various factors, including the claimant's daily activities; the duration, frequency, and intensity of the claimant's pain;

things that precipitate or aggravate the pain; the claimant's medications; and other treatments or measures used to alleviate the pain. SSR 16-3p, 2017 WL 5180304, at *7–8; 20 CFR 404.1529(c)(3).

An ALJ's findings concerning the intensity, persistence, and limiting effects of a claimant's symptoms must be explained sufficiently and supported by substantial evidence. *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). So long as the ALJ issues a reasoned explanation, the credibility determination is afforded "considerable deference" and will be overturned only if it is "patently wrong." *Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) (quoting *Terry*, 580 F.3d at 477). *See also Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008) ("Reviewing courts . . . should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported."). "Patently wrong is a high threshold—only when the ALJ's determination lacks any explanation or support . . . will [we] declare it to be 'patently wrong' and deserving of reversal." *Ray v. Saul*, 861 Fed. Appx. 102, 107 (7th Cir. 2021) (quoting *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008)) (internal quotation marks omitted).

The ALJ correctly stated the proper test for analyzing a claimant's credibility and then summarized medical records, the medications Plaintiff took, the treatments he underwent, his daily activities, things that precipitated and aggravated his pain, the functional limitations he claimed, and the opinions of various medical sources (Tr. 3196–3201). But from the Court's perspective, there are a multitude of issues with the ALJ's analysis.

As an initial matter, the ALJ omitted any discussion regarding the duration, frequency, and intensity of Plaintiff's pain. Plaintiff testified that his pain was constant and he was never not in pain. He testified that even with pain medications, his pain was usually somewhere between a five and an eight out of ten. The record is replete with instances where Plaintiff reported to medical providers and physical therapists that his pain was either not improved or even worsening despite using narcotics and undergoing various treatments to try to control it.

As it relates to those medications and treatments, the ALJ provided a cursory summary, stating:

> [T]he claimant's treatment included medications; injections; physical therapy; home exercise program; use of pain patches; use of TENS unit; use of back brace; recommendations to quit smoking; and encouragement to perform any physical activity, even if it hurts, with checking into water exercises so there is not so much pain.

(Tr. 3196; *see also* Tr. 3197). The ALJ listed his medications as Augmentin (which is an antibiotic), hydrocodone-acetaminophen, ibuprofen, ProAir (which is an inhaler), Nitroglycerin, Metoprolol, Atorvastin (which are all cardiac medications), Gabapentin, and MS Contin (Tr. 3196–97). The ALJ acknowledged that the various treatments Plaintiff received for his allegedly disabling symptoms, including surgery, and the fact that he "was prescribed and took appropriate medications for the alleged impairments," would normally weigh in his favor (Tr. 3196, 3197). However, the ALJ thought that weight was counterbalanced by the conclusion that the medications and treatments were "relatively effective" and "generally successful" in controlling Plaintiff's pain (Tr. 3196, 3197).

To begin with, the list of treatments and the list of medications are incomplete. Moreover, the way in which the medications and treatments are noted obscures the true nature of Plaintiff's treatment history. In particular, half of the medications listed have nothing to do with controlling Plaintiff's pain. The list fails to acknowledge that Plaintiff cycled through various powerful narcotic pain medications at ever-increasing doses, including Vicodin, Fentanyl pain patches, methadone, and morphine, in an attempt to find something that provided him with adequate relief. The list also fails to mention that Plaintiff took muscle relaxers on-and-off (but mostly on) for the entire duration of the time period at issue and that he tried various anti-anxiety medications and antidepressants, which also play a role in a pain management regimen (*see* Tr. 3196–97). The ALJ failed to mention that despite taking a raft of medications, there were still times where Plaintiff had severe and worsening breakthrough pain, which was addressed with oral steroids, shots of Toradol and Kenalog, and on one occasion the powerful opioid Dilaudid. As for treatments other than medication, Plaintiff tried physical therapy twice, used a TENS unit, repeatedly underwent epidural steroid injections as well as trigger point injections, and also underwent a procedure to break up the scar tissue in his spine, which the ALJ wholly failed to mention.

The ALJ also failed to explain how she concluded that Plaintiff's medications and treatments were effective or successful in controlling his pain (*see* Tr. 3196–32). The record is replete with instances where Plaintiff reported that his pain medications were *not working* and that his pain was either not improving or even worsening. He consistently reported that his pain level was a five or higher despite the medications and that he spent

much of his day lying in a recliner or on the couch. The record as a whole clearly shows that Plaintiff continuously struggled with serious and chronic pain throughout the five-and-a-half-year period at issue and the various medications and treatments he tried only provided him with limited (and sometimes very temporary) relief.

As the Seventh Circuit previously commented, what is significant is the improbability that Plaintiff would have undergone all the pain-treatment procedures that he did just to create the impression that he was experiencing pain and to increase his chances of obtaining disability benefits. *Heeman v. Astrue*, 414 Fed. Appx. 864, 868 (7th Cir. 2011); *Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004). *See also Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) ("Plessinger's allegations of pain were consistent with the strong prescription pain medication he was taking."); *Nimmerrichter v. Colvin*, 4 F. Supp. 3d 958, 971 (N.D. Ill. 2013) ("Mr. Nimmerrichter was taking narcotic pain relievers and psychotropic drugs, as well as seeking relief through epidurals and radiofrequency lesioning, suggesting that he wasn't faking his symptoms and perhaps not exaggerating to the extent the ALJ assumed."); SSR 16-3p, 2017 WL 5180304, at *9 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.") Simply put, the ALJ's conclusion that Plaintiff's medications and treatments were effective at controlling his pain is not supported by an objective review of the record.

Moreover, the ALJ's assessment of the medical records is also problematic. The ALJ distilled almost 800 pages of notes from various physicians and physical therapists into the following four-sentence blurb, which the ALJ repeated throughout the decision:

> The claimant's back examinations [demonstrate] tenderness, reduced range of motion, and occasional positive straight leg raising. His gait is found with slight limp to normal and he is able to do heel and toe walking. There is full strength, sensation, and reflexes in all areas. The claimant is also noted to display symptom exaggeration behavior.

(Tr. 3196; *see also* Tr.   3189, 3193, 3197, 3198, 3199).

The ALJ did not mention whether she thought the summarized medical records were consistent or inconsistent with the pain and limitations Plaintiff claimed. Some of the things the ALJ said appear to weigh in Plaintiff's favor and support his contention that he was in significant pain and greatly limited in his ability to function, while others things appear to weigh against Plaintiff and support the ALJ's decision to discount his statements. In particular, it appears that the ALJ thought being able to heel and toe walk and having full strength, sensation, and reflexes undermined the claimed severity of Plaintiff's pain and limitations. But the ALJ failed to explain how or why that was so or to cite to any medical opinion explaining the significance of these medical signs. The ALJ also failed to explain why these medical signs trumped the other objective findings that supported Plaintiff's account such as tenderness, reduced range of motion, trigger points, palpable spasms, and loss of lumbar lordosis. It is also not obvious to the Court as to how these particular medical signs are inconsistent with the pain and limitations Plaintiff claimed, especially when the records show that Plaintiff was still able to heel and toe walk normally and had full strength and sensation in his lower extremities in early 2010 shortly

before he had spinal surgery, when nerve compression was evident on his MRI (Tr. 494, 495, 496).

The second issue with the ALJ's assessment of the medical records is that portions of the ALJ's blurb do not fairly summarize the evidence in the record. Specifically, the ALJ repeatedly stated that Plaintiff was "able to do heel and toe walking" and had "full strength, sensation, and reflexes in all areas" (Tr. 3189, 3193, 3196, 3197, 3198, 3199), but there were medical records that said the opposite, which the ALJ seemingly ignored. Treating pain management physician Dr. Mitry said throughout 2015 that while heel and toe walking could be done, they both exacerbated Plaintiff's pain (Tr. 1447, 1451, 1456, 1457). State agency medical examiner Dr. Vittal Chapa noted diminished reflexes in August 2014, (*see* Tr. 1227), and nine months later, Dr. Mitry noted Plaintiff's reflexes were completely absent (Tr. 1447). Plaintiff's primary care physician, Dr. Davis, repeatedly noted weakness in both of Plaintiff's legs (Tr. 383, 388, 390, 392, 652–53, 654, 656). And the records of various physical therapists also consistently noted decreased strength (Tr. 239–354 (2010 physical therapy records); Tr. 686–95 (Clodfelter evaluation); Tr. 1086–1118 (2013 physical therapy records)). The ALJ was required to confront this contrary evidence and explain why she did not credit it. *See Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018) ("The ALJ may not select and discuss only that evidence that favors [her] ultimate conclusion, but must confront the evidence that does not support [her] conclusion and explain why it was rejected.") (internal citations and quotations marks omitted); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("In assessing a plaintiff's RFC, an ALJ must consider all relevant evidence in the case record and

evaluate the record fairly."); SSR 96-8p, 1996 WL 374184, at *7 ("The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."). In sum, the ALJ failed to build an accurate and logical bridge between the evidence and her conclusion that the medical evidence did not support Plaintiff's claims.

Another issue is that the ALJ glommed onto the one record where treating neurologist Dr. Narotam said that Plaintiff displayed "symptom exaggeration behavior" and used it as a reason to discount Plaintiff's subjective statements (Tr. 3189, 3193, 3196, 3197, 3198). The ALJ, however, said nothing about the various providers who explicitly stated that they thought Plaintiff was credible (Tr. 670, 680–81 (Dr. Fletcher, independent medical examiner); Tr. 1435 (Dr. Davis, primary care physician); Tr. 583 (Dr. Michael Nenaber, non-examining state agency medical consultant)). Nor did the ALJ explain why she chose to credit Dr. Narotam's statement, which was unaccompanied by any explanation, over Dr. Fletcher's statement, which was supported by objective medical signs, and the sworn testimony of Plaintiff's primary care physician Dr. Davis. Additionally, Dr. Narotam's lack of explanation for his statement makes it possible, as Plaintiff argued, that the ALJ misinterpreted it and Dr. Narotam simply meant Plaintiff complained of pain greater than expected without implying that Plaintiff was malingering. *See Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015) (explaining the ALJ mistakenly thought "the doctor who reported that Adaire might be 'having an exaggerated pain response' was accusing him of malingering, but this expression is actually medical jargon for a patient's experiencing more pain than his purely physical

problems would be expected to cause.").

As for Plaintiff's activities of daily living, the ALJ briefly summarized Plaintiff's answers on the various forms he provided to the Social Security agency (Tr. 3197 (citing Ex. 4E, 8E, 21E)).[20] However, the ALJ failed to mention any of the testimony Plaintiff provided at three separate hearings (*see* Tr. 3186–3203). And once again, the summary contains so few details that it begs the question of whether the ALJ considered all of the evidence Plaintiff presented. For example, the ALJ wrote that Plaintiff "was able to prepare meals." (Doc. 3197). While Plaintiff did indeed check the box indicating that he prepared meals, that was not the full extent of his answer. The summary neglected to mention that Plaintiff said he only prepared things like cereal or poptarts for breakfast and sandwiches for lunch, which took no more than five minutes, while his wife did all of the cooking for the family (Tr. 162, 1016).

Furthermore, there is no mention whether the ALJ thought Plaintiff's daily activities were consistent or inconsistent with the pain and limitations he claimed (*see* Tr. 3197). It is not enough just to describe the claimant's testimony; the ALJ must also analyze how the testimony factored into the credibility analysis. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir 2009). *Hollingsworth v. Saul*, No. 3:19-CV-744-RLM, 2020 WL 2731008, at *2 (N.D. Ind. May 26, 2020) ("A summary of evidence isn't the same as meaningful

---

[20] The ALJ wrote that Plaintiff said "he was able to prepare meals." (Doc. 3197). While Plaintiff did indeed checkmark the box indicating that he prepared meals, that was not the full extent of his answer. The ALJ neglected to mention that Plaintiff said he normally only prepared things like cereal or poptarts for breakfast and sandwiches for lunch, which took no more than five minutes (Tr. 162, 1016). His wife did the cooking for the family (Tr. 162).

analysis"). It seems to the Court that Plaintiff's extremely limited day-to-day activities are consistent with his claims of severe pain and limitations.

All of these issues lead the Court to conclude that he ALJ's decision to discount Plaintiff's statements regarding the intensity, persistence, and limiting effects of his pain is not supported by sufficient explanation or substantial evidence. Because the determination of whether benefits were warranted depended largely on the ALJ's assessment of the Plaintiff's subjective statements concerning his pain, the decision to deny Plaintiff benefits must be overturned again. In light of this conclusion, the Court need not explore in detail the remaining errors claimed by Plaintiff. But the Commissioner should not assume these issues were omitted from this Order because no error was found or that other issues do not exist in the underlying decision.

Notably, Plaintiff asks that the Court remand the case for rehearing, rather than remand with instructions to grant benefits (Doc. 21-1, p. 25). The latter remedy is a departure from the typical practice of remanding to the agency for further proceedings. *Martin v. Saul*, 950 F.3d 369, 376 (7th Cir. 2020) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 357 (7th Cir. 2005)). It is only appropriate "when the evidence before the court compels an award of benefits," meaning "all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Briscoe*, 425 F.3d at 355 (quoting *Campbell v. Shalala,* 988 F.2d 741, 744 (7th Cir. 1993)). Given that Plaintiff did not ask the Court to make this finding and neither party provided any input on the issue, the Court declines to undertake the analysis of whether the record demonstrates that the only possible outcome in this case is a finding that Plaintiff was disabled.

However, the Court believes that it is time for this case to come to a close. Plaintiff is now in his fifties. It has been fourteen years since his alleged disability onset date in April 2010, thirteen years since he first applied for disability benefits, and over eight years since his date last insured, which was September 30, 2015 (Tr. 143, 3189). As the Seventh Circuit has said, "it should not take [this long] to determine whether a claimant's impairments prevent him from engaging in full-time employment, especially a claimant who appears to have a well-documented and well-supported claim for disability." *Israel v. Colvin*, 840 F.3d 432, 441 (7th Cir. 2016). And that seems to be the case here—Plaintiff has presented substantial evidence which can be read in favor of an award of benefits. The evidence that could seemingly be read to undermine his claim is minimal by comparison. That said, it remains to be determined by the Social Security Administration whether the available evidence indicates that an award of benefits is appropriate for Plaintiff. On remand, if the agency again rejects Plaintiff's claim, it must provide a logical explanation, supported by a fair reading of the record and an attention to detail, for disregarding the opinions of Plaintiff's primary care physician and the independent medical examiner, his extensive medical history of treatments and his own consistent and unwavering statements about the severity and limiting effects of his pain. The Administration is strongly encouraged to expedite the proceedings in order bring this case to a close.

<u>C</u>ONCLUSION

The Commissioner's final decision denying Plaintiff Darrin H's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. §405(g), for further proceedings consistent with this Order. The Clerk of Court is directed to enter judgment in favor of Plaintiff

**IT IS SO ORDERED.**

**DATED: May 9, 2024**

<u>s/ Mark A. Beatty</u>
**MARK A. BEATTY**
**United States Magistrate Judge**